UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
ALVARO ENRIQUE BLANCO LAGUNA,    :

                            :          MEMORANDUM and ORDER

             Petitioner,    :

                            :           07-CV-5136 (ENV)

      -against-                :

                            :

LUZ MILA AVILA,                :

                            :

             Respondent.    :
------------------------------------------------------------------ x
VITALIANO, D.J.

        Alvaro Enrique Blanco Laguna ("Blanco") brings this petition pursuant to the

Hague Convention on the Civil Aspects of International Child Abduction, art. 2, Oct. 25, 1980,

T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, reprinted in 51 Fed. Reg. 10,494 (Mar. 26, 1986) (the

"Hague Convention" or the "Convention"), as implemented by the International Child Abduction

Remedies Act, 42 U.S.C. § 11601, et seq. (2000) ("ICARA"), seeking the return of his child.

The child was brought from Colombia to the United States in November 2006 by his mother,

respondent Luz Mila Avila, and has been retained here without Blanco's consent.

        The petition was filed on December 10, 2007, praying for, among other relief, a

preliminary injunction directing that the child be returned to Colombia. Upon consent of the

parties, the hearing on the preliminary injunction was consolidated with the trial of the

permanent injunction action. That trial was held on February 4 and 26, 2008. As authorized by

Rule 43(a) of the Federal Rules of Civil Procedure, Blanco testified via a live video link from

Colombia. Avila and three psychological experts, two called by respondent and the other by

petitioner, testified in open court. The Court interviewed the child in camera on the record but

1

outside the presence of the parties and their respective counsel.[1]

For the reasons set forth in this Memorandum and Order, which constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, the injunction is denied, the petition is dismissed and judgment is ordered to be entered for respondent.

## **Evidence at Trial**

1. Pedigree and Prior Proceedings

Blanco and Laguna married in Montaria, Colombia in December 1993. The marriage produced one child, ABA,[2] who was born in 1995 and is now 13 years of age.

Between 1995 and 1997, Blanco and Laguna lived together with ABA in Bogota, Colombia. In 1997, they separated. For several months immediately following the separation, ABA lived solely with Avila, but ABA began regular visits with Blanco sometime later that year. In 1999, the Colombian child welfare agency, the Instituto Colombiano de Bienestar Familiar (the "ICBF"), formally ordered weekend visitation between ABA and Blanco. Blanco and Avila were legally divorced in April 2004. Avila later married Thomas Eckmier, with whom she and ABA currently reside in Brooklyn, New York.

Avila's decision to move to the United States was made some time before January 2006. As a condition for ABA's potential relocation with Avila to the United States, Blanco required a modification to the parties' custody arrangements, which was agreed to by the parties in January 2006. Under the new agreement, ABA would live with Blanco during the week and would spend weekends with Avila, who was still in Colombia at that time. This agreement

---

[1]  This procedure is consistent with those adopted by other district courts in Hague Convention cases. See, e.g., Koc v. Koc, 181 F. Supp. 2d 136, 144 & n. 10 (E.D.N.Y. 2001).

[2]  To protect the identity of the child, pursuant to Rule 5.2 of the Federal Rules of Civil Procedure, the Court refers to him as ABA.

turned out to be provisional; it was never endorsed by the ICBF. The putative agreement

notwithstanding, ABA was consensually returned to Avila's custody in February 2006.

On July 19, 2006, the parties appeared before a family court administered by the

ICBF and entered into a new custody agreement, which was endorsed by the Colombian court,

thus, giving it binding effect (the "Custody Agreement"). The translated Custody Agreement

provides, in relevant part:

> 1. That as of this date the minor [A.B.A.], shall be under the Interim Personal Care of [Blanco] up to November 15, 2006 on which date the mother shall return to the country and this part shall be reevaluated.
>
>    . . . .
>
> 3. Visitation rights shall be established as follows: The minor shall visit his mother in the U.S. during school holiday from the beginning of July and the beginning of December until the beginning of the next academic period.
> 4. The minor shall travel to the U.S. with his mother between November 15 and February 15, and she agrees to obtain the appropriate authorization . . . for that period to return to the country. This could be amended should the mother obtain different information. Furthermore we wish to stress that the minor shall always leave on November 15 provided that he was promoted to the next academic year.
>
>    . . . .
>
> 7. In case the minor advises his father that he wishes to live with his mother in the U.S., at the time of his return to his country, the minor shall be permitted to travel and live with his mother once he is evaluated by a Psychologist of ICBF, in the town where he resides.
> 8. This agreement is subject to modification once the minor returns to his country in February 2007.

Soon thereafter, Avila left for the United States. With Avila's departure, ABA remained in

Blanco's custody in Colombia. As agreed by his parents, ABA came to the United States in

November 2006 to stay with Avila. Blanco's expectation, in accordance with the Custody

Agreement, was that ABA would return to Colombia in February 2007.

3

On another front, ABA's visa was set to expire in December 2006. Avila grew concerned that her son would not be permitted to re-enter to the United States if he returned to Colombia as planned. Apparently more concerned about re-entry than removal by American authorities, Avila visited the Colombian consulate in New York in January 2007 to seek relief from the provisions in the Custody Agreement requiring ABA's return to Colombia. She was told that the consulate could not offer her any help. Avila then wrote to the ICBF in Colombia, asking the agency to "change and/or deny several conditions of the agreement signed on July 16, 2006."

In the meantime, ABA did not return to Colombia in February 2007. He has remained in the United States with Avila ever since. On March 2, 2007, through a legal representative, Avila filed a demand for custody in the family court in Colombia. That demand was dismissed. On October 22, 2007, Avila filed a second demand for custody in Colombia. Blanco advised the Colombian court that he was seeking the return of ABA to Colombia through judicial proceedings that would be brought in the United States and asked the court to postpone resolution on the custody matter until the child returned to Colombia. It is presumed that the proceeding is still pending there, but stayed.

Blanco filed a Request for Return of the Child with the Central Authority of Colombia in April 2007, and supplemented his request in May 2007. Following formal transmission of the Request for Return to it by the Central Authority of Colombia, the Central Authority of the United States forwarded Blanco's case to pro bono counsel in the fall of 2007. The instant petition was filed on December 10, 2007. To advance the interests of justice, counsel for Avila was then appointed by the Court.

4

2. Testimony of the Experts

        Avila called Dr. Moses Weksler to testify at the hearing. His report was received into evidence. Dr. Weksler concluded that ABA is exceptionally bright and mature for his age. He also opined that, if the history of ABA's relationship with his father, as expressed by ABA, was accurate, ABA would be placed in a "very dangerous situation" if returned to Blanco's custody in Colombia. Dr. Weksler apparently based this opinion on the assumption[3] that Blanco is an alcoholic and is "very self centered." Dr. Weksler testified further that, in his opinion, returning ABA to Colombia, where he does not want to live, could lead to the development of psychopathology. (Hearing Tr. 82:19-83:7.)

        Avila also called Dr. Emily Schneider and her report was received into evidence as well. Dr. Schneider met with ABA twice; she was alone with him each time. She concluded that ABA does love his father and believes his father cares about him. She also gave her expert opinion that ABA is mature and capable of deciding whether he wants to stay in the United States with his mother. (Hearing Tr. 147:13-21.) Dr. Schneider opined further that, notwithstanding ABA's feeling of mutual love for and from his father, ABA wants to remain in the United States with his mother. (Hearing Tr. 137:13-22; 149:16-20.)

        The Court also heard testimony from Blanco's expert, Dr. Roy Lubit. As with the reports of the other experts, his report too was received into evidence. Dr. Lubit concluded that ABA seems appropriately mature for his age, but that he is not capable of deciding where he wants to live. (Hearing Tr. 97:9-99:24.) Dr. Lubit testified that, according to ABA, both parents have told him that his mother could be in a great deal of trouble—losing money and possibly going to jail—if she lost this case. According to Dr. Lubit, such information would put a lot of pressure on ABA and could easily lead him to say things that were not true. Dr. Lubit further

---

[3]    Dr. Weksler did not conduct an interview or face to face assessment of Blanco.

5

testified that, in his experience, a child will say that he wants to remain with whichever parent the child is currently residing, unless that parent is extremely abusive. (Hearing Tr. 98:1-5.) Dr. Lubit opined that, under the circumstances, ABA could not know whether he wanted to be in the United States or Colombia. (Hearing Tr. 99:10-24.) After talking with ABA and reading the reports of Dr. Weksler and Dr. Schneider, Dr. Lubit offered his expert opinion that the facts thus revealed provided no basis for the conclusion that ABA faced a grave or serious emotional risk by returning to Colombia.

As of the time of trial, ABA had been living in the United States with his mother and stepfather for nearly 15 months. During that period, Blanco has had sporadic contact with him by phone. Blanco has not seen ABA since November 2006.

### The Hague Convention

The Hague Convention, to which both the United States and Colombia are signatories, was adopted in 1980 "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Hague Convention, supra, Preamble. The Convention was designed to restore the pre-retention status quo and to discourage parents from crossing international borders in search of a more sympathetic forum. See Gitter v. Gitter, 396 F.3d 124, 129-30 (2d Cir. 2005). To dissuade family members from removing children to jurisdictions perceived to be more favorable to their custody claims, "the Hague Convention attempts 'to deprive [their] actions of any practical or juridical consequences.'" Id. at 130 (quoting Elisa Pérez-Vera, Explanatory Report on the 1980 Hague Child Abduction Convention, Acts and Documents of the 14th Session, vol. III 426, 429, ¶ 16 (1982) [hereinafter Pérez-Vera Report ]). Accordingly, the Convention provides for "the prompt return of children wrongfully removed to or retained in any Contracting State." Id. (quoting Pérez-Vera Report, supra, at 429, ¶ 16).

A petitioner in an action brought under the Convention has the burden to

6

establish, by a preponderance of the evidence, that the subject child has been wrongfully removed or retained. 42 U.S.C. § 11603(e)(1)(A). If a removal is wrongful, a district court must return the child to the country of his habitual residence unless the respondent can establish that one of the Convention's narrow defenses applies. See Blondin v. DuBois, 189 F.3d 240, 245 (2d Cir. 1999) [hereinafter Blondin II]. Even where a defense has been established, however, a court need not allow the child to remain with the "abducting" parent. Id. at 246 n.4. A court always retains, and should use when appropriate, the discretion to return a child to his home country if return would further the aims of the Convention. See Friedrich v. Friedrich, 78 F.3d 1060, 1067 (6th Cir. 1996) (construed in Blondin II, 189 F.3d at 246 n.4).

A court considering a Hague Convention petition has jurisdiction only over the wrongful removal or retention claim, and cannot consider the merits of any underlying custody disputes. See Hague Convention, supra, at art. 16; Croll v. Croll, 229 F.3d 133, 137 (2d Cir. 2000). "Put differently, the court's inquiry in a Hague Convention case is not 'the best interests of the child,' as it is in a state custody case; rather it is the specific claims and defenses under the Convention." Hazbun Escaf v. Rodriquez, 200 F. Supp. 2d 603, 610-11 (E.D. Va. 2002).

1. Prima Facie Case of Wrongful Retention

"In order to prevail on a claim under the Convention, a petitioner must demonstrate that (1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention." Gitter, 396 F.3d at 130-31. "The petitioner must establish these requirements by a preponderance of the evidence." Id. at 131 (citing 42 U.S.C. § 11603(e)(1)(A)).

A. Habitual Residence

The Hague Convention itself does not provide any definition of "habitually

7

resident." Id. at 131; Pérez-Vera Report[4], supra, at 441, ¶ 53 ("Following a long-established tradition of the Hague Conference, the Convention avoided defining its terms."). Recently, however, the Second Circuit has set forth a two-part framework for making this determination. First, "courts should begin an analysis . . . by considering the relevant intentions" of the person or persons entitled to fix the place of the child's residence, which, in most cases, are the child's parents. Gitter, 396 F.3d at 132. In making such a determination, the court should focus on the intent of the parties as of the last time that their intentions were mutually shared. Id. at 133. In most instances, this mutually intended residence will be the "habitual residence." There are, however, rare circumstances in which a child has become acclimatized to his new surroundings such that his habitual residence has shifted. Id. at 133-34.

  The court, therefore, in compliance with the second part of the framework, should next inquire whether the child's relative attachments to the two countries have changed such that the court can say with confidence that requiring return to the original forum would be tantamount to "taking the child out of the family and social environment in which [his] life has developed," and that "serious harm to the child can be expected to result from compelling his return to the family's intended residence." Id. at 134 (internal quotations omitted). The Second Circuit has specifically instructed that courts "should be slow to infer that the child's acclimatization trumps the parents' shared intent." Id. A child's habitual residence will not have changed merely because his life in the new country shows some minimal degree of settled purpose. Id.

  In the light of the Circuit's guidance, the Court finds that ABA's habitual residence is Colombia. There is no dispute that, prior to Avila's decision to move to the United States, the parties' mutual intent was for ABA to live in Colombia indefinitely. There also is no

---

[4] Elisa Perez-Vera's explanatory report has been recognized by the Second Circuit as an authoritative source for interpreting the Convention's provisions. See Gitter, 396 F.3d at 130 n.4 (citing Croll, 229 F.3d at 137),

dispute that ABA lived exclusively in Colombia and had never been to the United States before November 2006.

Avila contends that the parties' mutual intent changed some time in 2006, and that their mutual intent, as evidenced by the Custody Agreement, was for ABA's habitual residence to shift to the United States. The Court disagrees. At most, the Custody Agreement contemplated that the United States might someday become ABA's habitual residence. Evidence of the parties' intent to change a child's habitual residence sometime in the future is insufficient to demonstrate that the habitual residence has, in fact, changed. See Choi v. Kim (In re Kim), 404 F. Supp. 2d 495, 514 (S.D.N.Y. 2005) (evidence of shared intent that a child would become a New Yorker is insufficient to demonstrate that a child was a New Yorker as of the date of the alleged removal).[5] Moreover, the Court finds that Avila's pursuit of relief in the Colombian courts following ABA's travel to and retention in the United States amounts to at least some recognition that Colombia is ABA's habitual residence.

By equal strength, the evidence does not demonstrate that ABA had become wholly acclimatized to his new environment such that his habitual residence had shifted to the United States. See Paz v. Mejia De Paz, 169 F. Supp. 2d 254, 258 (S.D.N.Y. 2001) (finding no acclimatization to New Zealand, despite child's visit to New Zealand lasting nine or ten months prior to wrongful retention).

B. *Wrongful Removal or Retention*

The second and third elements of a prima facie case under the Hague Convention

---

[5] Avila argues, in the alternative, that ABA has no place of habitual residence, as the parties left the future of his residence in doubt when signing the Custody Agreement. Avila does not provide any legal support for her argument that ABA could be without a habitual residence and the Court is aware of none. See In re Kim, 404 F. Supp. at 514 (expressing doubt over whether it was possible for a child, who indisputably had a habitual residence at some point, to be without a habitual residence, and distinguishing that case from the question of determining when a newborn acquires a habitual residence).

require a petitioner to establish that the petitioner was exercising rights of custody at the time of the challenged retention and that the retention by the respondent was a breach of those custody rights. See Gitter, 396 F.3d at 130. Provided its legal efficaciousness is authorized by the law of the state where such custodial rights are claimed to have been created, a right of custody may arise by operation of law, by reason of a judicial or administrative decision, or by reason of an agreement of the parties. Id. In this case, Blanco's custody rights exist both by operation of Colombian law and under the private agreement between him and Avila.[6] More critically, given Blanco's right under the Custody Agreement to have ABA returned to Colombia in February 2007, there is no dispute that Avila breached Blanco's custody rights by her unilateral decision to retain ABA in the United States following the date it was previously agreed he would return to Colombia.

Accordingly, the Court finds that Blanco has satisfied his burden of establishing a prima facie case of wrongful retention under the Convention.

2. Defenses

Once a petitioner establishes that there was a wrongful removal and/or retention, the child must be repatriated to the country of his habitual residence unless the respondent can establish that one of the Convention's following defenses applies: (1) that judicial proceedings were not commenced within one year of the child's abduction and the child is well settled in the new environment, Hague Convention, supra, at art. 12; (2) that the petitioner was not actually exercising custody rights at the time of the removal, id. at art. 13(a); (3) that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation", id. at art. 13(b); or (4) that return of the child "would not be permitted by the fundamental principles . . . relating to the protection of human rights and

---

[6] Title XII, Article 253 of the Colombian Civil Code provides that both parents shall jointly exercise parental authority over their legitimate children.

fundamental freedoms," id. at art. 20. In addition to these numbered defenses, a court may "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Id. at art. 13. This other defense is often referred to as the "age and maturity defense." Regardless the category, however, each of these defenses is meant to be interpreted narrowly. See Blondin II, 189 F.3d at 246. "Were a court to give an overly broad construction to its authority to grant exceptions under the Convention, it would frustrate a paramount purpose of that international agreement—namely, to 'preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court.'" Id. (quoting Friedrich v. Friedrich, 983 F.2d 1396, 1400 (6th Cir. 1993)).

Avila raises three of the above defenses: the consent or acquiescence defense; the grave risk defense;[7] and the age and maturity defense. The Court addresses each in turn.

*A. Consent and/or Acquiescence*

Pursuant to Article 13(a) of the Convention, a court in the jurisdiction where a child habitually resident in another signatory state is alleged to be wrongfully retained is not bound to order the return of the child if the respondent demonstrates, by a preponderance of the evidence, that the petitioner "was not actually exercising the custody rights at the time of the removal or retention, or had consented to or subsequently acquiesced in the removal or retention." Hague Convention, supra, at art. 13(a); 42 U.S.C. § 11603(e)(2)(B). Avila argues that Blanco has consented to and/or acquiesced in ABA's retention in the United States. "The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." Baxter v. Baxter, 423 F.3d 363, 371 (3d Cir. 2005). "The key to the

---

[7] Avila appears to have abandoned the grave risk defense in her post-hearing memorandum. Nonetheless, the Court will address this defense for purposes of completeness.

consent inquiry is the petitioner's subjective intent, including the nature and scope of the intent." In re Kim, 404 F. Supp. 2d at 516. A showing of acquiescence requires a higher degree of formality; either a formal statement by petitioner or a consistent attitude of acquiescence over a significant period of time. See Friedrich, 78 F.3d at 1070.

Avila's proof on this defense falls short. Her consent argument is premised on the contention that Blanco agreed, pursuant to the Custody Agreement, that after returning to Colombia in February 2007, ABA could move to the United States if he so desired. This conditional agreement is insufficient to establish that Blanco consented to Avila's retention of ABA in the United States, where, as is uncontested, "the condition" never came to pass. More powerfully, Avila herself testified that she believed, as of January 2007, that "the child's father wanted him to return to Colombia without giving me any guarantee that he was going to come back and return and be with me in the United States," which, given the statement's proximity in time to ABA's departure from Colombia, is further proof that Blanco had not, impliedly or otherwise, consented to an effective modification of the Custody Agreement and to Avila's right to custody of ABA in the United States.

Avila's argument that Blanco subsequently acquiesced in ABA staying in the United States fails even more strikingly. Avila has not presented any evidence whatsoever of a formal statement or a consistent attitude of acquiescence by Blanco over a significant period. To be sure, any claim of acquiescence is belied by the fact that Blanco filed his initial petition for ABA's return in April 2007, within 10 weeks of the unlawful retention.

B. Grave Risk

Under Article 13(b), a court may decline to repatriate a child if the respondent establishes by clear and convincing evidence that returning the child would create a grave risk of physical or psychological harm. Hague Convention, supra, at art. 13(b); 42 U.S.C. § 11603(e)(2)(A); Blondin v. Blondin, 238 F.3d 153, 157 (2d Cir. 2001) [hereinafter

12

Blondin IV]. As the Second Circuit has explained,

> [A]t one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute grave risk under Article 13(b); the latter do.

Id. at 162. Even if a court finds there is a grave risk to the child, the inquiry is not ended. Before refusing repatriation, the court "must first determine whether there are any ameliorative measures that could be taken to mitigate this risk and enable a child to return safely to his home country," Reyes Olguin v. Cruz Santana (In re Reyes Olguin), No. 03 CV 6299 JG, 2005 WL 67094, at * 6 (E.D.N.Y. Jan. 13, 2005) (citing Blondin IV, 238 F.3d at 157), and, if so, then to order return upon such terms and conditions.

The evidence presented by Avila, even if taken as true, is insufficient to demonstrate that there would be a grave risk to ABA if returned to Colombia. Avila testified that Blanco abused alcohol during their marriage and was violent towards her. She maintains that Blanco continues to abuse alcohol, and ABA testified that his father drinks excessively, but there is no evidence in the record that Blanco currently has any drinking problem. More to the point, Avila did not present a shred of evidence that Blanco ever physically abused ABA, or that he is likely to do so if ABA is repatriated. Nor did any of the testifying psychologists offer an opinion that ABA had ever been physically or psychologically abused by his father or that ABA fears his father.[8] Much to the contrary, in addition to telling the psychologists and the Court that Blanco had never hit him, ABA acknowledged that he loves his father and that he would like it if his

---

[8] "A court may consider a child's testimony as part of its analysis under Article 13(b)." See Blondin IV, 238 F.3d at 166. In such cases a court must take account of the child's age and degree of maturity in considering how much weight to give his views. Id. at 166-67; see also discussion, infra.

father lived near him in America.

There was only one incident described by ABA (as well as by the parents) that involved any sort of danger to ABA at all. Sometime in 2005, around 11pm, while ABA was staying with Blanco and Blanco was said to be drinking too much, Blanco became angry with ABA and told him that he had to leave his house. Blanco called Avila to come pick ABA up, packed all of ABA's belongings and threw them outside. Blanco made ABA wait outside for his mother. ABA testified that that was the only time something like that had ever happened.

In this Circuit, moreover, even incontrovertible proof of a risk of harm will not satisfy the Article 13(b) exception if the risk of harm proven lacks gravity. See Blondin IV, 238 F.3d at 162. Cases that have approved invocation of the Article 13(b) exception have focused on evidence of a sustained pattern of physical abuse and/or a propensity for violent abuse. See, e.g., Elyashiv v. Elyashiv, 353 F. Supp. 2d 394, 408 (E.D.N.Y. 2005) (holding that the grave risk exception precluded return of children, where children had experienced physical abuse from father, had witnessed his abuse of their mother, and expert testified that their mere return to Israel would trigger their post-traumatic stress disorders, as well as 14-year-old's suicidal ideations). Evidence of sporadic or isolated incidents of abuse, or of some limited incidents aimed at persons other than the child at issue, have not been found sufficient to support application of the "grave risk" exception. See, e.g., Whallon v. Lynn, 230 F.3d 450, 460 (1st Cir. 2000) (affirming district court decision that a husband's verbal abuse and an incident of physical shoving directed at his wife was insufficient to establish a "grave risk" of harm to the child); McManus v. McManus, 354 F. Supp. 2d 62, 69-70 (D. Mass. 2005) (holding that two incidents of a mother striking two of her four children and a generally chaotic home environment were insufficient to establish a grave risk of harm because they did not show "a sustained pattern of physical abuse and/or a propensity for violent abuse"); Dallemagne v. Dallemagne (In re D.D.), 440 F. Supp. 2d 1283, 1299 (M.D. Fla. 2006) (finding "no credible evidence that

petitioner has ever physically harmed either of the two children" even though respondent alleged that he had been verbally abusive). Guided by these principles, it is plain, and the Court so concludes, that Avila has not established by clear and convincing evidence the existence of a "grave risk" to ABA if returned to his father's custody in Colombia.

Furthermore, even assuming, *arguendo*, that return to Blanco's custody in Colombia would place ABA in grave harm, there is nothing in the record from which the Court can conclude that there is a lack of ameliorative measures which the Court could order to protect against the claimed grave risk. See Blondin II, 189 F.3d at 249 (holding that a district court must make findings as to the availability of ameliorative measures and noting that the court could make arrangements for the child's return, including returning child to home country in a third party's care). Accordingly, the grave risk defense does not afford respondent a basis for relief.

## C. *Age and Maturity*

Under the unnumbered provision of Article 13, a court may refuse repatriation if a respondent demonstrates, by a preponderance of the evidence, that there is "considered objection to returning by a sufficiently mature child." Blondin IV, 238 F.3d at 166; see Hague Convention, supra, at art. 13 (a court "may refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views"); 42 U.S.C. § 11603(e)(2)(B). The Pérez-Vera Report, the Explanatory Report to the Convention, sheds light on the rationale behind this exception and its framers' intended application:

> [S]uch [a] provision is absolutely necessary given the fact that the Convention applies . . . to all children under the age of sixteen; the fact must be acknowledged that it would be very difficult to accept that a child of, for example, fifteen years of age, should be returned against its will.

Pérez-Vera Report, supra, at 433, ¶ 30. In short, though, there is no precise age at which a child will be deemed sufficiently mature under the Convention. See Blondin IV, 238 F.3d at 166;

Pérez-Vera Report, supra, at 433, ¶ 30 ("all efforts to agree on a minimum age at which the views of the child could be taken into account failed, . . . it seemed best to leave the application of this clause to the discretion of the competent authorities"). Rather, the child's maturity is a question for the district court, to be determined upon the specific facts of each case. Further, it is important to underscore that this defense only requires the Court to take account of a child's views.[9] The fact that he objects to return is not alone determinative. Finally, as with the other defenses recognized by the Hague Convention, this defense too is meant to be narrow.

Nonetheless, it borders on an ipse dixit to say that the subject child is the single most important witness where a court is considering the age and maturity exception to the Hague Convention's rule of return. With that in mind, the Court interviewed ABA in chambers outside the presence of the parties and their counsel. The Court first established that ABA understood the difference between telling the truth and not telling the truth and thereafter ascertained his credible promise to respond to the Court's questions truthfully and completely. Upon interview, ABA revealed himself to be bright, articulate and mature well-beyond what would reasonably be expected of a 13 year-old boy. He particularly impressed the Court with his mastery of the English language, which he has learned only in the short time that he has been in the United States. He exhibited, moreover, a perceptive understanding of the key issues presented for trial. The Court asked ABA if anyone had told him what to say during his interview and ABA said no; he had only been told to answer the Court's questions truthfully.

There is without doubt, of course, always an issue when a child has testified in a case involving his parents as to whether the testimony has been unduly influenced by his parents.

---

[9] "As with the other Article 13 exceptions to the return obligation, the application of [the age and maturity] exception is not mandatory. . . . A child's objection to being returned may be accorded little if any weight if [for example] the court believes that the child's preference is the product of the abductor parent's undue influence over the child." Department of State, Hague International Child Abduction Convention; Text and Legal Analysis, Pub. Notice 957, 51 Fed.Reg. 10,494, 10,509 (1986).

ABA has lived exclusively with Avila in the United States and has had only sporadic contact with Blanco. As Dr. Lubit pointed out in his testimony and accompanying report, there is a recognized tendency for a child to be influenced by the preferences of the parent with whom he or she lives. Courts have also recognized this phenomenon, and have cautioned that an abducting parent should not be rewarded, in effect, for wrongfully retaining the child for an extensive period of time. See Giampaolo v. Erneta, 390 F. Supp. 2d 1269 (N.D. Ga. 2004) (ordering the return of the child where child lived exclusively with the respondent in the United States for over two years).

Case law also makes clear, however, that the risk of undue influence in a child's testimony is no excuse for judicial paralysis. Such testimony should be taken, considered, and, where appropriate, can support an age and maturity defense. See, e.g., Matovski v. Matovski, 06 Civ. 4259 (PKC), 2007 WL 2600862, at *14 (S.D.N.Y. Aug. 31, 2007) (holding that 12 and 11 year old children sufficiently objected to return where they testified that they had more family and friends in the United States, enjoy a more stable life, and are concerned about uncertainties that they would face in home country); Diaz Arboleda v. Arenas, 311 F. Supp. 2d 336, 343-44 (E.D.N.Y. 2004) (holding that 12 and 14 year old children sufficiently objected to return where they expressed preference of staying with their mother and believed that they would have better opportunities in this country), de Silva v. Pitts, 481 F.3d 1279, 1287 (10th Cir. 2007) (affirming district court decision that 13 year old had satisfied the objection defense when child stated that he had made friends in the United States, described his house as "really big" and "a great place" where he has a computer and everything he needs for school and indicated that he thought the school was better here); Leites v. Mendiburu, No. 6:07-cv-2004-Orl-19DAB, 2008 WL 114954, at *6 (M.D. Fl. Jan. 9, 2008) (refusing repatriation where the court found that 13 year old was extremely bright, mature, and articulate and objected to return because she had been affected by the arguing in her home in Argentina and felt that her home in the United States provided a

17

calmer environment and afforded her better opportunities); but see Locicero v. Lurashi, 321 F. Supp. 2d 295, 298 (D.P.R. 2004) ("The fact that the [13 year-old] child prefers to remain in Puerto Rico, because he has good grades, has friends and enjoys sports activities and outings, is not enough for this Court to disregard the narrowness of the age and maturity exception to the Convention's rule of mandatory return.").

Here, there is no serious dispute that ABA has been told that there might be damaging consequences for his mother should the Court order his return to Colombia. At the same time, it is just as clear that, for the most part, the information about such dire consequences was given to ABA by Blanco, who told ABA that Avila would lose a great deal of money if she lost this case and even warned him that Avila could be put in prison in Colombia. ABA testified: "Always bad things that are going to happen to my mom, he tells me." (Interview Tr. 22:13-14.) Avila's husband also told ABA that Avila stands to lose a lot of money if she loses this case. These statements greatly concern the Court, not only because they potentially undermine the reliability of ABA's testimony, but also because they threaten his well-being.

That being said, the Court is convinced from ABA's in camera testimony that he honestly and free from any undue family pressure does not want to return to Colombia. The Court finds with specificity that ABA's objection to returning to Colombia is the product of independent reasoning and thoughtful consideration. His testimony did not appear forced or coached in any way. He expressed clearly that he was not worried about these proceedings or their impact on him or his parents, and that he did not think about the case often. (Interview Tr. 22:15-22.) Upon evaluation in the way a finder of fact should analyze the testimony of any witness, including his demeanor, the Court is struck by ABA's honesty, maturity, and intelligence. Without the slightest hint in the record of any psychopathology or social maladjustment on ABA's part, the Court has no doubt that the reasoned testimony provided by ABA represents his honest opinions and wishes and was not the product of his parents'

18

influence. Cf. Blondin v. Dubois, 78 F. Supp. 2d 283, 296 (S.D.N.Y. 2000) (finding that while child might have been coached by mother to some degree, her objection to being returned was not the product of mother's "undue influence"), aff'd 238 F.3d 153 (2nd Cir. 2001); Kofler v. Kofler, Civil No. 07-5040, 2007 WL 2081712 (W.D. Ark. July 18, 2007) (district court found that respondent might have been the impetus behind children's letters to the court, but that the children were not unduly influenced).[10]

Further, the Court's conclusion that ABA's objection to repatriation to Colombia is the product of his own reasoning is more than amply buttressed by his testimony that he likes his school here in the United States and that he makes good grades. He has made a lot of friends at school here, he claimed. (Interview Tr. 18:18-20, 24:3-4.) By contrast, ABA testified that he had had no real friends in Colombia and had performed poorly in school. (Interview Tr. 11:14-18, 19:5-8.) The Court was most impressed as ABA testified calmly but with deep feeling that he believes that the United States will provide him personally with far better opportunities in life than Colombia, because America "has more economy, more business, more industry, more opportunities, things like that." (Interview Tr. 25:11-25.) And, that, while he loved his father and wanted to be with him in America, if he had to choose between his father and America, he would choose America. (Interview Tr. 32:14-18.)

Notwithstanding, ABA's plainly expressed view to remain in the United States is without significance unless the Court first determines that ABA has the requisite age and maturity to take account of his view. To that end, ABA's understanding, insight and mental

---

[10] On this score, the Court finds significant that the party pressing ABA about the potentially ruinous consequences for Avila by a loss in this case was Blanco, the petitioner, and not Avila. To find that such conduct by a petitioner undermines the reliability of a child's objection and nullifies a defense to repatriation would invite petitioners in Hague cases to "poison the well." The Court need not tarry as to whether Blanco's warnings to ABA were designed for that purpose or what adverse evidentiary influence should be drawn from such conduct, for here the Court finds that ABA's testimony was not unduly influenced and that there was no overt attempt by Avila to exercise undue influence.

processes are as important, indeed, more important to a determination of his age and maturity. Viewing the evidence in totality, that is, including the testimony of the experts in psychology as well as the testimonial and demeanor evidence yielded by the in camera interview of ABA, the Court finds that ABA has clearly reached an age and shown such maturity that it is appropriate to take account of his views and, more to the point, his objection to returning to Colombia. Even more powerful on this reckoning is ABA's correct understanding that his subsequent return to America could not be guaranteed and the dispositive impact that fact had on his desire not to be repatriated.

Accordingly, the Court finds that, coupled with ABA's demonstrable age and maturity, the bases, breadth, depth and perceptive nature of his objection to his return to Colombia, including the effect such a result would have on his relationship with each parent, meets the narrow exception created by the Hague Convention's unnumbered defense to repatriation.

3. Does Equity Mandate Return?

The establishment of the age and maturity defense does not, however, end the Court's inquiry. A court retains the discretion to return a child to his home country, regardless of any other determination, if return would further the aims of the Convention. As noted above, the Hague Convention is "primarily concerned with the 'use of force to establish artificial jurisdictional links on an international level, with a view to obtaining custody of a child.'" Gitter, 396 F.3d at 129 (quoting Pérez-Vera Report, supra, at 428, ¶ 11). Thus, the Convention's principal goal is to deprive would-be abductors of the perceived advantages of "removing children to jurisdictions more favorable to their custody claims. . . ." Id. Equity can stop such a scheme dead in its tracks.

In ABA's case, the required further review does not alter the result. The Court finds that return of ABA to Blanco's custody in Colombia would be neither appropriate nor

20

necessary to further the goals of the Hague Convention. Avila did not come to the United States in order to gain a jurisdictional home court advantage. Indeed, as Blanco emphasizes, Avila has sought to resolve this matter through the Colombian court, just without physically returning to Colombia. Simply put, there is nothing in the record that would suggest Avila behaved as she did because she believed New York would be a more hospitable forum to have a custody battle. Therefore, the Court does not believe that return is necessary to further the objectives of the Hague Convention and declines to exercise its discretion to order the return of ABA to Colombia. See In re Kim, 404 F. Supp. 2d at 520-21 (district court declined to exercise discretion to repatriate child where respondent did not cross international borders in order to gain a jurisdictional home court advantage).

### Conclusion

For the foregoing reasons, an injunction ordering repatriation of the subject child to the custody of his father in Colombia is denied and the petition is dismissed. Each party is to bear its own costs.

The Clerk of the Court is directed to enter Judgment for respondent and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
May 6, 2008

s/ Judge Eric N. Vitaliano

ERIC N. VITALIANO
United States District Judge